# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Case No. No. CR-21-191-D |
| ) | |
| EUGENE DESHON HALL, ) | |
| ) | |
| Defendant. ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

Before the Court is Defendant's Motion to Suppress Firearm, Any Other Physical Evidence, and Any Incriminating Statements [Doc. No. 31], filed under Fed. R. Crim. P. 12(b)(3)(C). On November 17, 2021, the Court held an evidentiary hearing at which Defendant appeared personally and through appointed counsel, David Autry, and the government appeared through Assistant United States Attorneys Mary Walters and David Nichols. The Court heard the testimony of one witness, Detective David Hollis of the Oklahoma City Police Department (OCPD), and received into evidence one exhibit that was previously submitted with the government's brief [Doc. No. 37-1]. Counsel for the parties presented oral arguments and adopted their briefs. Upon consideration of the evidence, the case record, and the parties' arguments, the Court finds and rules as follows.

## FINDINGS OF FACT

The Superseding Indictment charges in Count 1 that on April 6, 2021, Defendant knowingly possessed a firearm after a prior felony conviction in violation of 18 U.S.C. § 922(g)(1), and in Count 2, that on October 2, 2021, Defendant tampered with a witness

in violation of 18 U.S.C. § 1512(b)(2)(B).[1]  Defendant moves to suppress the firearm (a Taurus revolver) that Detective Hollis found in Defendant's pocket on April 6, 2021, during a pat-down search.  Detective Hollis testified at the hearing concerning the events leading up to his encounter with Defendant and the circumstances surrounding Defendant's seizure by OCPD officers.  The evidence received at the hearing establishes the following facts pertinent to the Motion, as found by the Court.

Detective Hollis has 20 years of experience as an OCPD officer and is assigned to the vice enforcement unit.  On April 6, 2021, he was involved in an online prostitution investigation as an undercover contact officer, which means his role was to make contact with a suspected sex worker.  The operation began that evening with a briefing that covered individual assignments and officer safety, which is a concern in this type of investigation because it often takes place in a residence or a motel known for high crime activity.  Detective Hollis began by communicating with a person by text message using a telephone number listed in an online ad.  He arranged a meeting and agreed on amounts of time and money; he was given an address of 820 South MacArthur Blvd. in Oklahoma City, which is a Travelers Inn, and room number 110.  The motel is located in a high crime area and is known to OCPD officers as the location of multiple arrests for offenses involving prostitution, drugs, firearms, stolen cars, and other crimes.

---

[1] Count 2 alleges that Defendant knowingly used or attempted to use intimidation, threats, corrupt persuasion, or misleading conduct towards two individuals with the intent to cause or induce any person to alter, destroy, mutilate, or conceal an object (a cell phone) with the intent to impair the object's integrity or availability for use in an official proceeding.

When Detective Hollis arrived at Room 110, the door was opened by a female who resembled the photograph in the ad; she was later identified as Rachel Tate. During the conversation, Ms. Tate agreed to exchange sexual acts for money, and Detective Hollis placed the amount of cash ($200) on a dresser or table. He was wearing an audio device that allowed detectives outside the room to listen to their conversation, and he continued to talk while waiting for officers to enter the room.[2] Detective Hollis's stalling caused Ms. Tate to become wary of going forward; she told him to leave, opened the door of the room, and pushed him. Detective Hollis refused and said he was not leaving without the money. Ms. Tate then placed a call using her cell phone in speaker mode and holding it in a way that Defendant could see the screen and read a contact name of "Prince." The call was answered by a male voice. Ms. Tate said in effect, "You need to come to this room and get this person out of here." She did not give a room number. Detective Hollis believed from the exchange that Prince was Ms. Tate's pimp, who already knew where she was and what she was doing, and she was telling him that she needed assistance with a customer.

After the call, Detective Hollis was standing in the doorway, and he motioned for two detectives outside the room to enter. Like Detective Hollis, the officers were dressed in plain clothes. A supervisor who had been located in the parking lot then came and stood outside the door; he was wearing an outer vest marked "Police" on the front and back. All officers other than Detective Hollis were carrying firearms that were not displayed.

---

[2] For safety reasons, other officers are located nearby during an operation and monitor events through a listening device.

Ms. Tate was arrested for prostitution, handcuffed, and seated away from the door by an officer.

About two or three minutes after the phone call, a person knocked on the door of Room 110. The officers were anticipating the arrival of the person Ms. Tate had called, and Detective Hollis and another officer were standing near the door. The officer peeked through a window in the door and saw a male later identified as Defendant. Defendant was wearing a hooded sweatshirt with his hands inside the pockets.[3] In rapid succession once the door was opened, Detective Hollis grabbed Defendant's wrists to control his hands (in case he had a weapon), identified the officers as police, told Defendant to remove his hands from the pockets, and brought him into the room. Defendant was asked his name and identified himself as Prince. Defendant complied with the command to show his hands, removing them from his pockets while Detective Hollis maintained control of Defendant's wrists, and Detective Hollis then placed Defendant's hands behind his back and applied handcuffs supplied by another officer. Detective Hollis frisked Defendant for weapons and quickly located a firearm in the hoodie's front pocket. None of the officers drew their weapons.

When Detective Hollis touched the revolver in Defendant's pocket, Defendant stated voluntarily, and not in response to any questions, "that's a gun" and that it belonged to another person next door at the motel but that was okay because the person was not a

---

[3] The officers later learned Defendant had been dropped off in the parking lot by a vehicle driven by someone else.

felon.[4]  Detective Hollis removed the revolver from Defendant's pocket, disarmed it by clearing a live shell from the chamber, and otherwise made it safe.  Based on information developed during further investigation (including statements by Ms. Tate), Defendant was arrested for pandering and being a felon in possession of a firearm.

Detective Hollis explained his immediate use of handcuffs on Defendant as appropriate based on his training and experience and his assessment of the situation.  The specific circumstances identified in his testimony were, first, that he thought Defendant was Ms. Tate's pimp – based on the facts that he was a contact programmed into her phone, she immediately called him when a customer refused to leave, he knew where to find her without being told, and he came quickly to assist her – and, second, that pimps present a potential for a firearm or violence because they typically arm themselves for their protection, the protection of the sex worker, or sometimes robbing customers.  Detective Hollis also cited the location as a concern because of the high crime area, past criminal activity at the motel, and the possible presence of firearms and unknown individuals.  Detective Hollis admitted that the detectives did not know any particular facts about Defendant indicating that he personally presented a specific threat or was armed.  However, Detective Hollis perceived Defendant as a potential threat and possibly armed because of the nature of the investigation, the criminal activity involved, and because the

---

[4] The officers believed from surveillance that Room 112 was being used in connection with prostitution activity at the motel.  However, the person located in Room 112 was questioned and allowed to leave.

5

detectives believed Defendant was a pimp coming to assist a sex worker with an unruly customer and, therefore, would come prepared to act in a security or protector role.

## CONCLUSIONS OF LAW

The government bears the burden to prove the validity of a warrantless seizure. *See United States v. Neugin*, 958 F.3d 924, 930 (10th Cir. 2020); *see also Florida v. Royer*, 460 U.S. 491, 500 (1983). In this case, the government seeks to justify Defendant's seizure as an investigative detention permitted by *Terry v. Ohio*, 392 U.S. 1 (1968). "An officer can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (internal quotation omitted). Reasonable suspicion for a *Terry* stop exists if the officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* To determine the constitutionality of a *Terry* stop, courts ask both "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. "The government has the burden of demonstrating that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994) (internal quotations omitted).

Assuming first for purposes of discussion that Defendant's seizure was a *Terry* stop, the Court easily finds that OCPD detectives had reasonable suspicion that Defendant was engaged in criminal activity. Detective Hollis testified credibly that while acting in an

6

undercover role in a vice investigation, he observed conduct that led him to believe Defendant was engaged in the offense of pandering, that is, that Defendant was the pimp of a female suspect arrested for prostitution (Ms. Tate).[5]  Specifically, Defendant was the male individual who arrived at the door of Room 110 within two to three minutes after Ms. Tate called a male contact named "Prince" to come and remove a difficult customer from her room.  The person whom Ms. Tate called to assist her appeared to understand the nature of the problem and to know her location without being told.  Under the circumstances, it was reasonable for the detectives to believe Defendant was answering Ms. Tate's call and was involved in prostitution activity, and thus, they had reasonable suspicion of criminal activity by Defendant.

Turning to the harder question presented by Defendant's arguments, the Court must determine whether the detective's actions were reasonably related to the circumstances that justified the interference.  If police officers use intrusive measures that "exceed the limits of a *Terry* stop, the detention 'becomes an arrest that must be supported by probable cause.'"  *See United States v. Copening*, 506 F.3d 1241, 1248 (10th Cir. 2007) (quoting *United States v. Neff*, 300 F.3d 1217, 1220 (10th Cir. 2002)).  In setting limits, the Supreme Court has eschewed "bright-line rules" and "rigid criteria" in favor of "common sense and ordinary human experience."  *Id*. (internal quotations omitted); *see United*

---

[5] The Oklahoma criminal statute includes in the definition of pandering: "[a]ny person who shall procure any other person for prostitution, or who, by promise, threats, violence or by any device or scheme shall cause, induce, persuade or encourage another person to become a prostitute; or shall procure a place as inmate in a house of prostitution for another person . . . ." *See* Okla. Stat. tit. 21, § 1081.

*States v Sharpe*, 470 U.S. 675, 685 (1985). "[A] *Terry* stop is not rendered unlawful, per se, by officers' use of handcuffs and weapons." *Copening*, 506 F.3d at 1248. "Because police officers need not take unnecessary risks in the line of duty, they may take precautionary measures that are reasonably necessary to safeguard their personal safety, and to 'maintain the status quo,' during a *Terry* stop." *Id*. (quoting *United States v. Shareef*, 100 F.3d 1491, 1495 (10th Cir. 1996)); *see United States v. Hensley*, 469 U.S. 221, 235 (1985)). The court of appeals has "upheld police officers' use of handcuffs . . . during a *Terry* stop where they reasonably believe such measures are necessary to ensure officer safety." *Copening*, 506 F.3d 1241, 1248 (quoting *Neff*, 300 F.3d at 1220).

Defendant asserts that his seizure immediately upon arriving at Room 110 was a custodial arrest – and not merely an investigatory detention – because the detectives lacked a factual basis to believe handcuffing him was necessary. He argues that Detective Hollis could articulate no specific safety concern posed by Defendant or his conduct; he was not acting in a threatening manner and complied with the officers' instructions. He entered a room controlled by police officers who outnumbered him three to one. Detective Hollis testified that he had no specific information that Defendant was personally armed or violent, and thus, in Defendant's view, there was no legal justification for using handcuffs. Defendant relies primarily on *United States v. Soza*, 686 F. App'x 564 (10th Cir. 2017), in which the court held that two police officers investigating a possible burglary acted unreasonably, and so exceeded the limits of a *Terry* stop, by brandishing firearms and handcuffing a compliant suspect who made no threatening gestures or suspicious movements and for whom they had no information to suggest he was armed.

Upon examination, the facts presented in *Soza* are plainly distinguishable. There, the police officers' encounter with a robbery suspect occurred on "a June afternoon" in "a gated and generally peaceful condominium complex." *See id*. at 565. Three women inside a unit reported that a man had banged on the front door, threw a rock through a sliding glass door at the back, and apparently entered the unit, but then left before officers responded to the women's 911 call. The responding police officers circled the building and twice encountered a man who roughly matched the women's description of the suspect. On the first occasion, the man was walking outside another nearby building; they instructed him "to go back in;" and he "immediately complied and calmly walked back to the building from which he came." *Id*. On the second occasion, they approached the man (who was the only person they saw) while he was standing on a front porch of the nearby building. The court described the sequence of events as follows:

> Without hesitation or further inquiry the officers unholstered their firearms, held them in a low and ready position, and instructed Defendant to put his hands on his head. Defendant calmly obeyed. The officers then came up onto the porch to handcuff Defendant. Again, Defendant did not resist or otherwise make any threatening gestures or movements as they did so.

*Id*. at 566.

The Tenth Circuit reversed the district court's denial of the defendant's motion to suppress evidence the officers found when they handcuffed him and conducted a pat-down search. The court of appeals was not persuaded by the government's argument that "the officers' brandishing of their firearms and handcuffing of Defendant . . . were reasonable, precautionary corollaries of an investigatory *Terry* stop of an individual who may have been a potentially violent burglar." *Id*. at 568. The court reasoned that although the

9

officers knew the burglar was potentially violent due to the broken glass door and entry into the unit, they "had no information suggesting the unidentified burglar was armed," and the defendant displayed a "calm and submissive demeanor." *Id*. at 569. The court acknowledged "that the officers had to make a quick decision on how to proceed and that we should not second-guess from the safety of the courtroom their ultimate choice to use handcuffs," but the court concluded that the particular circumstances encountered by the officers did not justify their decision to handcuff the defendant.

In this case, like *Soza*, Defendant obeyed the officers' directions and made no gestures or suspicious movements; he was outnumbered by two-to-one (at least); and there were no other people in the near vicinity that the officers were concerned about protecting. *See id*. at 569-70. Unlike *Soza*, however, the vice detectives awaiting Defendant's arrival in Room 110 had other reasons to reasonably believe the circumstances warranted the use of handcuffs.

This encounter happened at night in a high crime area and in a motel known as a location of criminal activity that often involved firearms. The detectives reasonably suspected Defendant was a pimp who was coming to act as an enforcer in removing an unruly customer from a prostitute's room, and they knew from training and experience that a person acting in this role was probably armed with a weapon or prepared for violence. Defendant was wearing a loose-fitting garment and had his hands in the pockets. The point man, Detective Hollis, was unarmed and reasonably perceived a need to control a volatile situation by restraining Defendant's hands while he determined whether Defendant was carrying a weapon. Detective Hollis was able to quickly make this determination in

10

a safe manner by applying physical restraints, that is, grabbing Defendant's wrists and then applying handcuffs. The Court declines to second guess the judgment of experienced vice officers actively engaged in an on-the-scene investigation.

Defendant's counsel seems to argue that the detectives' use of handcuffs was unlawful because Detective Hollis stated that his unit routinely handcuffed detainees based on a general view that handcuffing was reasonable and necessary for officer safety due to the nature of vice investigations. However, "[i]n measuring the actions of a police officer under the Fourth Amendment, [courts] look at the objective facts, not the officers' state of mind." *Neff*, 300 F.3d at 1222 (citing *Maryland v. Macon*, 472 U.S. 463, 470 (1985)).[6] Defendant's allegation of a flawed police procedure does not undermine the conclusion that the scope of his detention under the particular facts of this case did not violate the Fourth Amendment.

For these reasons, the Court finds that the forceful techniques used to effect an investigatory detention of Defendant were reasonable under the circumstances and did not convert a *Terry* stop into a custodial arrest. The Court further finds the pat-down search that yielded a Taurus revolver in Defendant's pocket was fully justified and Defendant's incriminating statements were not made in response to a custodial interrogation.

---

[6] In assessing whether certain factual circumstances turned a property transaction into a seizure, the Supreme Court stated: "Whether a Fourth Amendment violation has occurred turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time, and not on the officer's actual state of mind at the time the challenged action was taken." *Macon*, 472 U.S. at 470-71 (internal quotation and citation omitted).

Therefore, the Court finds that no Fourth Amendment violation occurred and that the firearm and evidence against Defendant were lawfully obtained.

## ORDER

IT IS THEREFORE ORDERED that Defendant's Motion to Suppress Firearm, Any Other Physical Evidence, and Any Incriminating Statements [Doc. No. 31] is DENIED.

IT IS SO ORDERED this 23rd day of November, 2021.

_____
TIMOTHY D. DeGIUSTI
Chief United States District Judge